**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSSETTS**

| | |
|---|---|
| IBRAHIM SOZEN, Derivatively on Behalf of SES AI CORPORATION,<br><br>Plaintiff,<br><br>QICHAO HU, ANDREW BOYD, ERIC LUO, JIONG MA, and MICHAEL NOONEN,<br><br>Defendants,<br><br>and<br><br>SES AI CORPORATION,<br><br>Nominal Defendant. | Case No.:<br><br>**JURY TRIAL DEMANDED** |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Ibrahim Sozen ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of SES AI Corporation. ("SES AI" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy the Individual Defendants' (defined below) violations of state and federal law that have caused substantial harm to the Company.

## JURISDICTION

2. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as Plaintiff's claims raise a federal question under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"). This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

3. This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

4. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) one or more of the defendants either resides in or maintains executive offices in this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District; and (iv) defendants have otherwise

purposefully availed themselves of this District through issuing false statements in this District and otherwise operating in this District.

5. In connection with the acts, transactions, and conduct alleged herein, the Individual Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

### Plaintiff

6. Plaintiff is, and was at all relevant times, a shareholder of the Company and presently owns shares of the Company's common stock. Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

### Nominal Defendant

7. ***Nominal Defendant SES AI*** is incorporated in Delaware and its head office is located at 35 Cabot Road, Woburn, Massachusetts 01801. The Company's common stock trades on the New York Stock Exchange (the "NYSE") under the ticker symbol "SES."

### Director Defendants

8. ***Defendant Qichao Hu*** ("Hu") served as the Company's Chief Executive Officer ("CEO") and Chairman at all relevant times. According to the Company's 2025 Proxy Statement, Defendant Hu received $4,099,946 in total compensation in 2024.

9. ***Defendants Andrew Boyd*** ("Boyd") served as a director of the Company at all relevant times since September 2025.

10. ***Defendant Eric Luo*** ("Luo") served as a director of the Company at all relevant times. According to the Company's 2025 Proxy Statement, Defendant Luo received $248,983 in total compensation in 2024.

11. ***Defendant Jiong Ma*** ("Ma") served as a director of the Company at all relevant times. According to the Company's 2025 Proxy Statement, Defendant Ma received $263,983 in total compensation in 2024.

12. The above-named defendants are collectively referred to herein as the "Director Defendants"

13. ***Defendant Michael Noonen*** ("Noonen") served as a director of the Company at all relevant times through to his resignation, effective September 2, 2025. According to the Company's 2025 Proxy Statement, Defendant Noonen received $231,483 in total compensation in 2024.

14. The Director Defendants together with Defendant Noonen are collectively referred to herein as the "Individual Defendants."

## MATERIALLY FALSE AND MISLEADING STATEMENTS

15. On January 29, 2025, before the market opened, SES AI issued a press release entitled "SES AI Signs an MOU With AISPEX Targeting up to $45 Million to Provide up to 100 MWh Advanced Battery Energy Storage System ("BESS") Solution With AI for Safety and First Deployment at a Crypto Mining Site in Texas." The press release announced, in part, the following:

> [SES AI], a global leader in the development and manufacturing of AI-enhanced high-performance Li-Metal and Li-ion batteries, today announced that it has signed a nonbinding Memorandum of Understanding ("MOU") with AISPEX, a Texas-based Retail Energy Provider ("REP") with a groundbreaking Virtual Power Plant platform.
>
> Under this partnership, SES is expected to provide high-performance BESS solutions including its proprietary AI for Safety Battery Management System to

> monitor battery health and safety. The MOU targets a purchase order pipeline of up to $45 million and up to 100 MWh, with the first deployment in 2025 expected to be a project of up to 30 MWh for up to $13 million, to be completed in two phases at a crypto mining site in Texas.

16. On February 25, 2025, SES AI held its earnings call for the fourth quarter of 2024 (the "Q4 2024 Call"). Defendant Hu made the following statement on the Q4 2024 Call:

> … SES AI is planning to expand into a new and growing field, Battery Energy Storage Systems, BESS. Last month, we announced that SES AI signed an MOU with AISPEX targeting up to $45 million to provide up to 100-megawatt hours of advanced Battery Energy Storage Systems, BESS solution with AI for Safety and the first deployment at a crypto mining site in Texas. This relationship is the first of its kind for SES AI, and we believe that this is something that can be replicated with additional partners in the future. This project will involve our battery safety platform, Avatar, which includes our AI for Manufacturing and AI for Safety solutions.

17. Defendant Hu also made the following statement on the Q4 2024 Call:

> … I want to address the important work we have accomplished in Urban Air Mobility or UAM drones and robotics. In January, at the CES 2025 show, we unveiled an AI-enhanced 2170 cylindrical cell for humanoid robotics. Earlier in 2024, we signed a significant purchase order with Data Blanket for drones for forest fire management and with SoftBank for HAPS communication satellites.
>
> This was a game changer as these AI-enhanced 2170 cells are the first batteries to use an electrolyte discovered by SES AI's Molecular Universe effort, which maps the physical and chemical properties of the entire universe of small molecules suitable for battery electrolytes 10 to 11 molecules.

18. On September 18, 2025, SES AI issued a press release entitled "SES AI Announces Closing of UZ Energy Acquisition." The press release stated the following, in pertinent part:

> [SES AI announces] the completion of its previously announced acquisition of Shenzen UZ Energy Co., Ltd. ("UZ Energy"), a leader in premium energy storage systems ("ESS"). With this acquisition, SES AI is positioned to become an active player in the global $300 billion ESS market.
>
> UZ Energy adds established ESS hardware, the potential for expansion in North America, and an existing customer base in Australia, Europe and Asia. Currently, SES AI is entering the multi-hundred GWh ESS market by integrating cells, modules, packs, and AI-enabled safety/health systems. By combining UZ Energy's hardware with SES AI's software, the Company will be able to offer customers a

fully integrated solution and an immediate commercialization scale.

19. On October 14, 2025, the Company issues a press release entitled "SES AI Signs Term Sheet to Establish Joint Venture to Commercially Supply Materials Discovered by Molecular Universe." The Release stated the following, in part:

> [SES] today announced that it has signed a term sheet to establish a joint venture with Hisun New Energy Materials Ltd. Co. ("Hisun"), a Texas-based electrolyte contract manufacturer, to commercially supply electrolyte materials discovered by SES AI's Molecular Universe. The joint venture, which will be 90% owned by SES AI, is subject to the execution of a binding definitive agreement, which is expected to be executed by the end of this month.
>
> In just six months after the original launch of Molecular Universe, SES AI and its enterprise customers have used Molecular Universe to discover several novel electrolyte materials including:
>
> • Low-to-medium content silicon anode Li-ion electrolyte for EV applications,
>
> • High content silicon anode Li-ion electrolyte for drones and robotics applications,
>
> • Li-Metal electrolyte for drones and eVTOL applications, and
>
> • Lithium iron phosphate (LFP) Li-ion electrolyte for ESS applications.
>
> The proposed joint venture marks a major milestone in the validation of these newly discovered electrolytes, as the JV intends to produce and supply them on a commercial scale. In addition to the Molecular Universe's existing SaaS model that includes software subscriptions and development services, the JV is expected to represent a new recurring revenue source for the Company by supplying discovered materials to customers globally.

20. The press release quoted Defendant Qichao Hu as saying the following:

> We have already demonstrated how quickly Molecular Universe can accelerate material discovery for battery makers. As announced with our latest version, MU-1, our plan is to use the Molecular Universe as a building block to grow our electrolyte materials and our battery cell supply strategies. We expect this JV to provide us with a new source of recurring revenue and allow us to maintain a capex-light approach by leveraging Hisun's existing manufacturing capacity to accelerate commercial supply of these AI discoveries[.]

21. On November 12, 2025, the Company filed with the SEC its quarterly report on

Form 10-Q for the period ending September 30, 2025 (the "Q3 2025 Report"). Attached to the Q3 2025 Report were certifications pursuant to SOX signed by Defendant Hu attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

22. The Q3 2025 Report contained the following risk disclosure under the heading "We depend upon component and product manufacturing and logistical services provided by third parties, many of whom are located outside of the U.S." It stated the following:

> A significant amount of our components in our ESS products are manufactured in whole or in part by a few third-party manufacturers. Many of these manufacturers are located outside of the U.S. If a catastrophic event occurs relative to these third-party manufacturers, or the political, social, or economic conditions shift within their respective geographies or between trade partners, we could experience business interruptions, delayed delivery of products, or other adverse impacts to our ongoing business. While these arrangements may lower operating costs, they also reduce our direct control over production and distribution. Such diminished control could have an adverse effect on the quality or quantity of our products as well as our flexibility to respond to changing conditions. In addition, we rely on third-party manufacturers to adhere to the terms and conditions of the agreements in place with each party. For example, although arrangements with such manufacturers may contain provisions for warranty expense reimbursement, we may remain responsible to the customer for warranty service in the event of product defects. Any unanticipated product or warranty liability, whether pursuant to arrangements with contract manufacturers or otherwise, could adversely affect our reputation, financial condition, and operating results. In addition, any adverse change in any of our manufacturers financial or business condition could disrupt our ability to supply quality products to our customers. If we are required to change our manufacturers, we may lose revenue, incur increased costs and damage our end-customer relationships. In addition, porting to and qualifying a new manufacturer and commencing production can be an expensive and lengthy process.

23. On January 16, 2026, Defendant Hu participated in the 28th Annual Needham Growth Conference, where he fielded questions from an analyst. Defendant Hu made the following statement at the conference:

> So, our goal at SES AI is to accelerate energy transition through AI, and then we are uniquely positioned to do this, because we have more than a decade of experience in the battery domain with data and domain knowledge, and especially

> developing one of the toughest battery chemistries, lithium metal.
>
> And this capability of core material discovery and safety monitoring is really important for the development of next-gen battery technologies. And then also we're seeing the energy transition now is requiring the integration of both AI software and hardware. And then we are taking our core capability, material discovery and battery safety monitoring, to address several large and fast-growing markets, including ESS and also drones. And ESS market is expected to be more than 10 times the size of EV, and both ESS and drones battery market are expected to have very exciting growth. And our core IP is a platform called Molecular Universe that includes the material discovery and battery health management.
>
> And then we provide really exciting competitive advantage in energy storage, cells, and also materials business. And then Molecular Universe has also evolved into our own AI for Science company, and this asset is really exciting, and there are private companies that have very exciting valuation in this space.
>
> From a finance perspective, last year, 2025, just in the first three quarters, we booked a revenue of $16.4 million, and then we provided a guidance of $20 million to $25 million for the full year 2025. And then we'll share more about Q4 and the entire '25 and also '26 guidance in the next month when we do Q4.

24. The above-referenced statements were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to the Individual Defendants or recklessly disregarded by them. Specifically, the Individual Defendants made false and/or misleading statements and/or failed to disclose that: (i) SES AI overstated its business prospects by materially overstating the expected results that could be achieved by deals with companies that have limited or no operations; (ii) SES AI created an appearance of revenue by purchasing services in exchange for purchases of Molecular Universe; (iii) contrary to its positive statements regarding growth prospects, SES AI was affected by material logistics constraints in the fourth quarter of 2025 which would materially affect Q4 2025 revenues; (iv) the foregoing called into question SES AI's growth prospects for 2026, which were confirmed due to lower than expected 2026 revenue guidance; and (v) as a result, the statements about SES AI's business, operations, and prospects, were materially

false and misleading and/or lacked a reasonable basis at all relevant times.

25. On November 17, 2025, just a few days after the Q3 2025 Report was filed with the SEC, Dr. Hong Gan, the Company's Chief Science Officer, sold 250,000 shares of Company stock for $497,500 in proceeds. On January 22, 2026, shortly after Defendant Hu's appearance at an investor conference, Dr. Hong Gan sold another 250,000 shares of Company stock for $590,000 in proceeds.

**THE TRUTH BEGINS TO EMERGE**

26. On December 9, 2025, Wolfpack Research ("Wolfpack") issued a report entitled "SES's Dying Biz Pivoting into Another AI Pipedream? Phantom Deals and a Related Entity Whose Registered Agent Was Allegedly Part of a $1 Billion Ponzi Scheme" (the "Wolfpack Report" or the "Report").

27. Wolfpack announced the following in the Report:

> We are short [SES] because they have announced phantom deals and promoted an AI product ("Molecular Universe") that looks to us like a Chat GPT wrapper to distract from its impending loss of two major customers, Honda and Hyundai, at the end of 2025. To replace this massive hold in their income statement, SES has purchased UZ Energy, a Chinese Energy Storage System (ESS) provider, a low-margin China-based company whose US-based related entity used a registered agent who settled a bankruptcy-related case brought against him for allegedly participating in a $1 billion Ponzi scheme.

28. The Report further said the following about UZ Energy:

> SES closed the acquisition of Chinese ESS company, UZ Energy, in mid-September, apparently for $25.5 million. UZ Energy appears to have little American presence, a related entity's U.S. listed incorporation address shares an address with two other entities, King Solarman and Fly Battery Testing.
>
> What these companies share is their registered agent, Chianglian "Michael" Cung. Cung is not just listed as the agent for King Solarman, he is also the CEO.
>
> In 2021, as part of a Nevada bankruptcy proceeding, Cung was sued by the trustee who alleged that he had helped Jeff Carpoff launder money as part of his billion dollar Ponzi scheme.

29. The Report further stated:

In January 2025, SES signed an MOU with Texas based retail energy provider AISPEX, projecting it would generate a "*major portion of revenue for 2025*" forecasting up to $45 million in revenue from the deal. A former employee told us, "*the announcement [of the deal] was a complete surprise and then it was like nobody ever talked about it ... they did nothing to fulfill it*." [alteration in sentence in original]. Import records show that the last shipment to AISPEX's headquarters was in 2021 for PPE masks, delivered to a previous venture of AISPEX's CEO at this same address. We visited AISPEX's headquarters in Texas and found a shabby building and a yard littered with shipping containers; oddly, the sign on the building displays a different company's name.

30. The Report then provided the following image:



31. Further describing the location, the Report said the following:

Our recent site visit to AISPEX's incorporation address reveals why [SES AI] might not want to talk about AISPEX. The address listed for its "headquarters," 839 FM 1489, Brookshire TX 77423, is a ramshackle building surrounded by shipping containers & sheds and the signage on the building is for a different business, OTEK Energy.

32. The Report then provided the following images, showing the "OTEK" name on a building, instead of AISPEX:





33. The Report stated the following about OTEK Energy and AISPEX:

> OTEK Energy is a business incorporated in the same town (Brookshire, TX) that also appears to be in the battery industry. We were unable to find any other documented physical location for AISPEX within Texas, let alone the United States, which is peculiar because the company's website suggests the company has genuine operations.
>
> It appears AISPEX's CEO (Peng Xiang "Paul" Nie) also uses this address as the incorporation location for other companies he either owns or manages[.]
>
> Setting aside the question of whether AISPEX has substantial operations, our research indicates that nothing has come from the deal between AISPEX and SES.

34. The Report gave further detail about AISPEX, stating the following under the heading, consistent with the above, "We Think The 'up to $45 Million' MOL Was Either an Unacknowledged Failure or a Hoax – Our Site Visit Revealed 'Headquarters is Occupied by Another Company, and SES has been Radio Silent about Progress":

> SES signed a non-binding memorandum of understanding (MOU) in January 2025 with AISPEX (which claims to be a Texas-based retail energy provider) to provide them a battery energy storage system (BESS) at a "crypto mining site in Texas." The MOU targeted a purchase order pipeline of up to $45 million with the first deployment in 2025.
>
> In their February 2025 company presentation, SES promoted this to investors as a major opportunity to generate meaningful revenues in 2025 and beyond, targeting "up to $45 million for the provision of up to 100 MWh of advanced BESS solutions." Given the loss of their GM partnership in 2024, the inclusion of this new MOU was an important part of reassuring investors especially since they announced a $150 million ATM offering three days after the release of their annual shareholder letter.

35. The Report then stated:

> We believe SES's recently announced "AI" joint venture with Hisun New Energy Materials is more smoke and mirrors. Hisun's website depicts a large facility, which apparently was expected to start construction in May 2024 on a 200,000 square foot cite with production starting in July 2025. Our due diligence indicates that the listed address remains undeveloped. Hisun's US entity appears to only have one US employee per LinkedIn. Additionally, we found the company's listed corporate address (pictured below) is a residential home.

36. The Report then provided the following image of Hisun New Energy Material's purported corporate address:



37. The Report said the following about Hisun, in relation to the October 24, 2025 press release, as discussed above:

> On October 14th, SES announced it had signed a term sheet to establish a joint venture with Hisun New Energy Materials Ltd. Co. (Hisun). Hisun is described as "*a leading electrolyte contract manufacturer with over 150,000 tons in annual global capacity*."
>
> The joint venture is to reportedly be 90% owned by SES where Hisun will supply electrolyte materials "*discovered by SES AI's Molecular Universe*." [. . .]
>
> * * *
>
> There is no timeline provided, and that is important because as of today, Hisun's US subsidiary (which is part of the JV) does not appear to have any substantial US operations, with its addresses apparently being some undeveloped swamp and a residential home in Texas.
>
> Apart from its residential address, Hisun has a website with a picture of a large facility that it wants to build in Texas. It has purchased land for this facility in Texas, but our due diligence indicates that this parcel remains an undeveloped swamp. Satellite photos of the parcel indicate no buildings are there, we did not observe any activity during a site visit, and county tax records indicate no improvements have been made to the land. Additionally, our search of county records found no permits signaling this land is about to be developed. As seen below from our site visit to the property, the vicinity quite literally appears to be swampland.

38. The Report then showed the following images:



39. The Report then stated the following about Hisun:

Hisun's parent company had apparently planned on starting this project in 2024 and getting it into production in 2025: The parent's company website [. . .] says Hisun's first phase of the project in Texas "*covers an area of 30 acres, with a designed construction area of about 200,000 square feet. It is expected to start construction in May 2024 and start production in July 2025*."

* * *

Clearly there have been some major delays. So where will Hisun manufacture these electrolyte materials? The only other address we could find for Hisun in the US [is from its corporate documents], which is in a residential home. So, perhaps in the kitchen of this bungalow?

40. The Report then provided the following image:



Article 1 - Entity Name and Type

The filing entity being formed is a limited liability company. The name of the entity is:

Hisun New Energy Materials Ltd Co

Article 2 – Registered Agent and Registered Office

A. The initial registered agent is an organization (cannot be company named above) by the name of:

OR

B. The initial registered agent is an individual resident of the state whose name is set forth below:

Name:

Haoyi Zhao

C. The business address of the registered agent and the registered office address is:

Street Address:

21626 Grand Hollow Ln Katy TX 77450



**Source:** Texas Secretary of State Filings, Google Maps

41. The Report then stated the following (and showed the image below) about the home

owned by Hisun, as stated above:

> Property tax records for the above home show that a seemingly misspelled and nonexistent entity "Hisan New Energy Materials LTD CO" appears to own just one piece of property: a 2023 Ford Mustang Mach-E Premium as seen below.




**Source:** Fort Bend County Property Search, VIN# traced using AutoZone Lookup *(Note: Mustang may be a different color. This is for informational purposes only.)*

42. The Report then stated that Hisun appeared to have, according to Wolfpack's findings, only one employee in the United States.

43. The Report stated the following (and showed the below image) about SES AI's relationship with Data Blanket:

> On SES's Q4 2024 earnings call, SES's CEO took the opportunity to highlight a "significant purchase order" it had signed with AI drone manufacturer, Data Blanket, for the company's Li-Metal cells. SES says this revenue would come with 63% gross margin, "*demonstrating the [SES's] strong value proposition of our technology and Allin on AI strategy*." [alteration in original].
>
> Data blanket is a small AI drone startup based in Bellevue, Washington which appears to have 10 employees per LinkedIn. We searched Data Blanket's import records and discovered that the company has only received one import for "Torison Bar(s)" from Israel as shown below.




> We could find no record of any SES entity shipping Li-Metal cells to Data Blanket. We doubt this "significant purchase order" ever came to fruition.
>
> Like its deal with AISPEX, SES only mentioned this deal in its SEC filings one time, in its shareholder letter filed February 25th, 2025 immediately before its ATM [offering]. Why haven't they mentioned this deal in any other SEC filings? What happened to all the gloriously high margin revenues they were going to get?

44. The Report stated in part the following about why Wolfback believed that SES has resorted to touting deals with entities that do not appear cable of meaningful business:

> We think SES has resorted to promoting these [bull****] deals because the real deals it had with OEMs (Honda, Hyundai, and GM) are either dead or in their death throes. Remaining performance obligations dropped 92% in the last quarter, indicating OEMs have lost interest in working with SES.

45. The Report stated the following about SES's AI platform, Molecular Universe:

> SES's pitch now centers on an AI platform called the Molecular Universe that supposedly saves researchers thousands of years of research discovering new battery chemistries (and who has that kind of time!). But a former employee did not see real value, "*It's great to have materials that exist in theory on your computer, but you run into a major bottleneck trying to synthesize the material and test it in a lab*."

46. The Report further stated the following (including a quotation with an alteration):

> While the Molecular Universe was unveiled in April 2025, a former employee told us that they were "*not aware of anybody that is paying for* it." A former employee highlighted some transactions concerning the Molecular Universe that they found suspicious; "*In exchange for buying a bunch of equipment from a company, that company would turn around and purchase a license to Molecular Universe so SES could count that as revenue*." And furthermore, "*there are some very conveniently*

> *timed announcements of SES purchasing a bunch of equipment or chemicals from a certain supplier and then that supplier also buying a license [to Molecular Universe].*" If SES is engaging in what could be perceived as inauthentic or circular transactions to generate the appearance of demand for the Molecular Universe, it could raise serious questions from investors about the legitimacy of SES's enterprise.

47. The Report further stated the following under the heading "A Former Employee Cast Doubts on the Usefulness of the Molecular Universe and Highlighted Conveniently Timed Transactions" (all alterations in discussion with former employee from original, and italicization in original).

> SES appears to be staking its future on the absurdly named, "Molecular Universe." To better understand this product, we spoke with a former employee who was familiar with the product and what it had to offer. This employee cast doubts on the usefulness, and ultimately the economic value of the product.
>
> > **Wolfpack Analyst:** *So would you buy [the Molecular Universe]? …*
> >
> > **Former Employee:** *I would not …. [T]here is a huge bottleneck when you actually try to synthesize and test those compounds. … So there's the main problem is synthesis. It's going to generate some compound and it can do that fairly quick but then it has to go to a synthetic chemist….[M]ost of the promising computational suggestions die at the synthesis stage. But then if you can get through the synthesis stage of actually making the compound in the lab there's a bunch of other criteria that it has to meet in order to be a good material.*
> >
> > *So for example, it can't be toxic. It can't you know react with the other materials that are in the battery. So there's the anode and the cathode, but then there is copper foil and aluminum foil, which can potentially corrode. There's nickel. There's polymers in there so the material or the electrolyte must be compatible with all of those.*
> >
> > **Wolfpack Analyst:** *What value is this molecular universe tool bringing to your industry? If anything? Is it just a toy? …*
> >
> > **Fomer Employee:** *I would say at this point, it's kind of a toy.*
>
> What should really concern investors is that this negative sentiment is apparently shared by SES's target market, since, according to this former employee, they did not know anyone who was interested in paying for the product for its own sake.

> **Wolfpack Analyst:** *Is anyone paying a fee for this?*
>
> **Former Employee:** *I mean, the molecular universe was offered with a subscription model, I think.* ***I'm not aware of anybody that's paying for it****.... It's great to have materials that exist in theory on your computer, but if you run into a major bottleneck trying to synthesize the material and test it. In our lab, which it ultimately what you're trying to get to* [italicized bolding in original].

This former employee later clarified that SES may be recording revenue for the product, but that they believed the willingness of some customers to subscribe was really coming from the fact that SES was paying them for equipment and supplies, not a strong demand for the product.

> "*I don't know if there is a word for this businesswise, but* ***in exchange for [SES] buying a bunch of equipment from a company, that company would then turn around and purchase a license to Molecular Universe****. So SES would count that as revenue, but really they're just buying something from another company and getting a rebate in return*." [Emphasis in original].

We do not know how material the revenue is coming from these shenanigans, but the potential use of these accounting gimmicks certainly raises questions about the reliability of management[.]

48. On March 4, 2026, after market close, SES AI Corporation held its earnings call for the fourth quarter of 2024 (the "Q4 Call"). CFO Jing Nealis revealed the following about material issues impacting Q4 results:

> Full year revenue came in at $21 million, in line with our guidance, but impacted primarily by logistics constraints that delayed shipments at the end of the year, resulting in approximately $1.5 million of revenue being pushed out to the first quarter of 2026.

49. Also on March 4, 2026, the Company issued a press release entitled "SES AI Reports Fourth Quarter and Full Year 2025 Results." In this release, the Company announced that 2026 revenue was projected to be in the range of $30 to $35 million.

50. This guidance came in below market expectations, and confirmed the allegations of the Report to the extent that it alleged that SES AI was materially overstating its growth prospects.

51. Commenting on these results and 2026 guidance, on March 5, 2026, Benzinga published an article entitled "SES AI Stock Plunges 30% After Weak 2026 Revenue Guidance." The article stated that SES "shares are trading sharply lower [. . .] after the lithium-metal battery developer posted mixed fourth-quarter results and issued a 2026 sales outlook that trailed Wall Street expectations."

52. The article further stated the following:

> The main drag on sentiment was SES AI's 2026 revenue guidance. The company projected sales of $30 million to $35 million, well below the $51.67 million analysts were expecting, raising concerns about the pace of commercialization for its Energy Storage Systems, drone battery and materials businesses.

53. On this news, SES AI Corporation stock fell $0.63 per share, or 36.8%, to close at $1.08 on March 5, 2026.

**SHARE REPURCHASES**

54. According to the Company's SEC filings, the Director Defendants authorized a share repurchase program for the Company to repurchase up to $30 million of its common stock. While the Company's share price was artificially inflated as a result of the misconduct alleged herein, the Individual Defendants caused the Company to repurchase its own common stock, causing harm to the Company, as follows:

| Date | Number of Shares Repurchased | Average Price per Share ($) | Total Paid ($) | Total Overpayment ($)[1] |
|---|---|---|---|---|
| July 2025 | 871,754 | 1.27 | 1,107,127.58 | 165,633.26 |

55. Because the Company's common stock was actually worth $1.08 (*i.e.*, the price it

1 "Total Overpayment" refers to the amount the Company overpaid for its common stock and is calculated by subtracting what the Company should have paid for its stock at its true price of $1.08 per share, as it was when the truth was fully revealed, from what the Company actually paid for its common stock at artificially inflated prices, *i.e.*, the "Total Paid ($)".

was following the full extent of the data breach being revealed), the Company should have paid $941,494.32 for its repurchases. Instead, the Individual Defendants caused the Company to make these harmful repurchases at artificially inflated prices, causing the Company to overpay for its own common stock by approximately $165,633.26.

## DAMAGE TO THE COMPANY

### Securities Class Action

56. On April 27, 2026, a securities class action complaint was filed in the United States District Court for the District of Massachusetts against the Company and Defendant Hu. The complaint alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5, in the case captioned: *Patel v. SES AI Corp., et al.*, Case No. 1:26-cv-11894 (D. Mass.) (the "Securities Class Action").

57. As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Company's officers. The Company will continue to incur significant sums in relation to the Securities Class Actions and any liability or settlement that results.

### Share Repurchases

58. As alleged above, the Individual Defendants caused the Company to repurchase its own common stock while it was trading at artificially inflated prices. As a result, the Individual Defendants caused the Company to overpay by more than $165,000.

### Unjust Compensation

59. At all relevant times, the Company paid lucrative compensation to each of the Individual Defendants. The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company.

60. Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent Huer. Further, each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, as described *infra*, for which they were compensated for.

61. However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein. Because the Individual Defendants failed to carry out their respective duties, the compensation they received was excessive and undeserved. As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

**Additional Damage to the Company**

62. In addition to the damages specified above, the Company will also suffer further losses in relation to any internal investigations and amounts paid to lawyers, accountants, and investigators in connection thereto.

63. The Company will also suffer losses in relation to the Individual Defendants' failure to maintain adequate internal controls, including the expense involved with implementing and maintaining improved internal controls.

64. The Company has also suffered, and will continue to suffer, a loss of reputation as a direct and proximate result of the Individual Defendants' misconduct which will plague the Company's share price going forward.

## CORPORATE GOVERNANCE

65. At all relevant times, the Company had in place extensive corporate governance

documents imposing duties and responsibilities on its directors and officers, and additional duties on the Company's committee members. Accordingly, each of the Individual Defendants were required to comply with the corporate governance documents, as detailed below.

66. Despite the following corporate governance, the conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Individual Defendants were aware posed a risk of serious injury to the Company.

**Code of Conduct**

67. At all relevant times, the Company had in place its Code of Business Conduct and Ethics ("Code of Conduct") which "applies to all directors, officers and employees of SES AI Corporation and its subsidiaries." The Code of Conduct "s intended to (1) emphasize the Company's commitment to ethics and compliance with the law, (2) set forth basic standards of ethical and legal behavior, (3) provide reporting mechanisms for known or suspected ethical or legal violations and (4) help prevent and detect wrongdoing."

68. In a section regarding "Compliance with Laws, Rules and Regulations," the Code of Conduct states:

> Obeying the law, both in letter and in spirit, is the foundation on which the Company's ethical standards are built. All Covered Persons must respect and obey the laws of the cities, states and countries in which we operate. Although not all employees are expected to know the details of these laws, it is important to know enough to determine when to seek advice from supervisors, managers or other appropriate personnel. Covered Persons should strive to identify and raise potential issues before they lead to problems, and should ask about the application of this Code whenever in doubt. Any questions relating to how these policies SHOULD BE INTERPRETED OR APPLIED SHOULD BE ADDRESSED TO THE CHIEF LEGAL OFFICER.

69. In a section entitled "Timely and Truthful Public Disclosure," the Code of Conduct

states:

> It is the Company's policy to make full, fair, accurate, timely and understandable disclosure in compliance with all applicable laws and regulations in all reports and documents it files with, or submits to, the Securities and Exchange Commission and all other governmental, quasigovernmental and self-regulatory bodies and in all other public communications made the Company. Covered Persons shall not knowingly falsify information, misrepresent material facts, or omit material facts, necessary to avoid misleading the Company's independent public auditors or investors. Covered Persons shall never take any action to coerce, manipulate, mislead, or fraudulently influence the Company's independent auditors in the performance of their audit or review of the Company's financial statements.

70. In a section entitled "Accountability for Adherence to this Code," the Code of Conduct provides:

> All Covered Persons are expected to comply with all of the provisions of this Code. The Code will be strictly enforced throughout the Company and violations will be dealt with immediately.
>
> If the Company's Audit Committee, Chief Legal Officer, Chief Financial Officer, or their respective designees determine that this Code has been violated, either directly, by failure to report a violation, or by withholding information related to a violation, the offending Covered Person may be disciplined for noncompliance with penalties up to and including dismissal. Such penalties may include a written letter of reprimand, disgorgement, suspension with or without pay or benefits, and termination of employment.
>
> Violations of this Code may also constitute violations of law and may result in criminal penalties and civil liabilities for the offending Covered Person and the Company. All Covered Persons are expected to cooperate in internal investigations of alleged misconduct.

71. The Individual Defendants failed to adhere to the Code of Conduct when they issued false and misleading statements and engaged in the wrongdoing described herein. Additionally, the Individual Defendant's failure to maintain the accuracy of Company records and reports, along with their failure to report other mismanagement, violates the Code of Conduct's sections regarding ethical obligations, confidentiality, and company assets.

**Audit Committee Charter**

72. At all relevant times, the Company had in places its Audit Committee Charter which set forth the additional duties and responsibilities of the Audit Committee members. The Audit Committee Charter provides that the role of the Committee is to "Provide assistance to the Board with respect to its oversight of:"

> (a) The quality and integrity of the Company's financial statements, including the oversight of the Company's accounting and financial reporting processes and the financial statement audits;
>
> (b) The Company's compliance with legal and regulatory requirements applicable to financial statements and accounting and financial reporting processes;
>
> (c) The independent registered public accounting firm's qualifications, performance and independence; and
>
> (d) The performance of the Company's internal audit function.

73. The Audit Committee Charter also sets out the following specific duties and responsibilities, in relevant part:

> The following functions shall be the common recurring activities of the Committee in carrying out its responsibilities. These functions should serve as a guide with the understanding that the Committee may carry out additional functions and adopt additional policies and procedures as may be required or appropriate in light of business, legislative, regulatory, legal or other conditions or changes. The Committee shall also carry out any other responsibilities and duties delegated to it by the Board from time to time.
>
> The Committee, in discharging its oversight role, is empowered to study or investigate any matter of interest or concern that the Committee deems appropriate. In this regard, the Committee shall have the authority, in its sole discretion, to engage and terminate independent counsel and other advisers, as it determines necessary or appropriate to carry out its duties. The Company shall provide appropriate funding, as determined by the Committee, for payment of compensation to the independent registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company and any advisers that the Committee chooses to engage, as well as funding for the payment of ordinary administrative expenses of the Committee that are necessary or appropriate in carrying out its duties.
>
> The Committee shall be given full access to the Company's internal auditors (or other personnel or service providers responsible for the internal audit function),

Board, corporate executives, employees and independent registered public accounting firm as necessary to carry out these responsibilities.

Notwithstanding the foregoing, the Committee is not responsible for certifying the Company's financial statements or guaranteeing the independent registered public accounting firm's report. The fundamental responsibility for the Company's financial statements and disclosures rests with management while the independent registered public accounting firm is responsible for conducting the annual audit in accordance with the standards of the Public Company Accounting Oversight Board (the "PCAOB").

Documents/Reports Review

1. Review and discuss with management and the independent registered public accounting firm prior to public dissemination the Company's annual audited financial statements and quarterly financial statements, including the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

2. Discuss with the independent registered public accounting firm the overall scope and plans for their audits and other financial reviews, as well as matters required to be discussed by the applicable auditing standards adopted by the PCAOB and approved by the SEC from time to time, including any critical audit matters.

3. Review and discuss with management and the independent registered public accounting firm the Company's earnings press releases (paying particular attention to the use of any "pro forma" or "adjusted" non-GAAP information and measures), as well as financial information and earnings guidance provided to analysts and rating agencies. The Committee's discussion in this regard may be general in nature (i.e., discussion of the types of information to be disclosed and the type of presentation to be made) and need not take place in advance of each earnings release or each instance in which the Company may provide earnings guidance.

4. Review and discuss with management and the independent registered public accounting firm any major issues arising as to the adequacy and effectiveness of the Company's internal controls, any actions taken in light of material control deficiencies and the adequacy of disclosures about changes in internal control over financial reporting.

***

Financial Reporting Process

11. In consultation with the independent registered public accounting firm, management and the internal auditors (or other personnel or service providers responsible for the internal audit function), review the integrity of the Company's

financial reporting processes. In that regard, the Committee must obtain and discuss with management and the independent registered public accounting firm reports from management and the independent registered public accounting firm regarding:

- all critical accounting policies and practices to be used by the Company;

- analyses prepared by management and/or the independent registered public accounting firm setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including all alternative treatments of financial information within GAAP related to material items that have been discussed with the Company's management, the ramifications of the use of the alternative disclosures and treatments, and the treatment preferred by the independent registered public accounting firm;

- major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles;

- major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; and

- any other material written communications between the independent registered public accounting firm and the Company's management.

The Committee should also obtain and discuss with the independent registered public accounting firm other material written communications between the independent registered public accounting firm and management, such as any management letter or schedule of unadjusted differences.

12. Review periodically the effect of regulatory and accounting initiatives, as well as off-balance sheet structures (if any), on the financial statements of the Company.

13. Review with the independent registered public accounting firm (i) any audit problems or difficulties encountered by such firm in the course of the review or audit work, including any restrictions on the scope of its activities or on access to requested information, and any significant disagreements with management and (ii) management's responses to such matters. Without excluding other possibilities, the Committee may wish to review with the independent registered public accounting firm (i) any accounting adjustments that were noted or proposed by such firm but were "passed" (as immaterial or otherwise), (ii) any communications between the audit team and the independent registered public accounting firm's national office respecting auditing or accounting issues presented by the engagement and (iii) any "management" or "internal control" letter issued, or proposed to be issued, by the independent registered public accounting firm to the Company.

Internal Audit

14. Oversee the Company's internal audit function, which may be outsourced to a third-party service provider.

15. Review the significant reports to management prepared by the internal auditors (or other personnel or service providers responsible for the internal audit function) and management's responses.

16. Review and discuss the responsibilities, budget and staffing of the Company's internal audit function with management and, if appropriate, with the independent registered public accounting firm and/or any third-party service provider providing internal audit services to the Company.

Legal Compliance / General

17. Periodically review and discuss with the Company's Chief Legal Officer, or their designee any legal matters that have been brought to the Committee's attention and that could have a significant impact on the Company's financial statements.

18. Review and discuss with management and the independent registered public accounting firm the Company's guidelines and policies with respect to risk assessment and risk management. The Committee should discuss the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.

19. Oversee the Company's cybersecurity risk management programs and review reports from Company management and external advisors, if any, on cybersecurity, data privacy and other risks relating to the Company's information system controls and security.

20. Set clear policies for the Company's hiring of partners or employees or former partners or employees of the independent registered public accounting firm. At a minimum, these policies must provide that any independent registered public accounting firm may not provide audit services to the Company if the Chief Executive Officer, controller, Chief Financial Officer, chief accounting officer or any person serving in an equivalent capacity for the Company was employed by the independent registered public accounting firm and participated in any capacity in the audit of the Company during the one-year period preceding the date of the initiation of the audit.

21. Establish procedures for: (i) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters; and (ii) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

> 22. Unless otherwise approved or ratified pursuant to the Board's "Related Person Transaction Policy," the Committee shall review and approve or ratify all transactions between the Company and any Related Person that are required to be disclosed pursuant to Item 404(a) of Regulation S-K ("Item 404(a)) or otherwise required to be approved pursuant to NYSE Rules. "Related Person" shall have the meaning given to such term in Item 404(a) of Regulation S-K.
>
> 23. Review and approve at least on an annual basis, if applicable, the decisions by management to enter into derivative transactions on a cleared or non-cleared basis, and the policies and processes of the Company related thereto, and review and recommend to the Board on matters pertaining to the Company's derivative transactions and hedging strategy.
>
> <u>Reports</u>
>
> 24. Prepare the Audit Committee report required by the SEC to be included in the Company's annual proxy statement.
>
> 25. Report regularly to the Board, including: (i) with respect to any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the qualification, performance and independence of the Company's independent registered public accounting firm or the performance of the internal audit function; (ii) following meetings of the Committee; and (iii) with respect to such other matters as are relevant to the Committee's discharge of its responsibilities. The Committee shall provide such recommendations to the Board as the Committee may deem appropriate. The report to the Board may take the form of an oral report by the Chairperson or any other member of the Committee designated by the Committee to make such report.
>
> 26. Maintain minutes or other records of meetings and activities of the Committee.

74. The Audit Committee failed to uphold their duties required by the Audit Committee Charter by failing to conduct oversight of the Company's engagement in the Individual Defendants' issuing false and misleading statements to the public. Furthermore, the Audit Committee violated the Audit Committee Charter by failing to maintain the accuracy of Company reports and records, failing to comply with laws and regulations, and failing to properly report violations to the rest of the Audit Committee.

## <u>FIDUCIARY DUTIES OF THE DIRECTOR DEFENDANTS</u>

75. As members of the Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

76. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

77. By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith. The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful Huer. The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

78. Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets. In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

79. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and

controls of the affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and investing public;

(b) conduct the affairs of the Company in an efficient, businesslike Huer so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d) remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e) ensure that the Company was operated in a diligent, honest, and prudent Huer in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f) ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

80. Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

81. The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company. As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

82. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, gross mismanagement, and other wrongful conduct as alleged herein.

83. Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

84. Plaintiff is a current owner of the Company's common stock and has continuously been an owner of the Company's stock during the times relevant to the Director Defendants'

wrongful course of conduct alleged herein. Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

85. Because of the facts set forth herein, Plaintiff has not made a demand on the Board to institute this action against the Individual Defendants. Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

86. At the time this suit was filed, the Company's Board was comprised of four (4) members, consisting of the Director Defendants. Thus, Plaintiff is required to show that a majority of the Director Defendants, *i.e.*, two (2), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

87. The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act

**THE DIRECTOR DEFENDANTS ARE**
**NOT INDEPENDENT OR DISINTERESTED**

88. Each of the Director Defendants face a likelihood of liability in this action because they caused and/or permitted the Company to make false and misleading statements and omissions concerning the information described herein. Because of their advisory, managerial, and directorial positions within the Company, the Director Defendants had knowledge of material, non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

89. The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

90. Each of the Director Defendants, by virtue of their roles, were required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent Huer. Despite this, the Director Defendants failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

91. As trusted Company directors, the Director Defendants conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets.

92. Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

93. Each of the Director Defendants reviewed, authorized, signed, and thus personally made and/or otherwise permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various

false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

94. Moreover, each of the Director Defendants permitted and/or caused the Company to repurchase its own common stock at artificially inflated prices, causing the Company to overpay for its own common stock in violation of Section 10(b) of the Exchange Act. As a result, each of the Director Defendants face a substantial likelihood of liability.

95. Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

96. Despite having knowledge of the history of their own misconduct and mismanagement, the Director Defendants have failed to seek recovery for the Company for any of the misconduct alleged herein.

**Defendant Hu**

97. Defendant Hu is neither disinterested nor independent and is thus incapable of considering a demand to sue because he (as its CEO) is an employee of the Company who derives substantially all of his income from his employment with the Company, making him not independent. As such, Defendant Hu cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

98. As CEO, Defendant Hu also fails the bright-line independence test as set forth under stock exchange rules and cannot, therefore, be considered independent, as admitted by the Company in its 2026 Proxy Statement. As such, Defendant Hu could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon

Defendant Hu is therefore futile.

99. Defendant Hu also personally reviewed, signed, authorized, and/or made the false and misleading statements alleged herein during earnings calls, in SEC filings, press releases, and in other public forums. Thus, as a main perpetrator of the wrongdoing alleged herein, Defendant Hu is irreconcilably conflicted, faces a substantial likelihood of liability, and cannot consider a demand to sue.

100. In addition, Defendant Hu receives lucrative compensation in connection with his employment with the Company. Defendant Hu is not independent from the Director Defendants serving on the People, Culture and Compensation Committee ("Compensation Committee") and are responsible for evaluating and determining the compensation of the CEO and Executive Officers, including Defendant Hu. The purpose of the Compensation Committee is to assist the Board in discharging its responsibilities related to the compensation provided by the Company to its CEO and Executive Officers. Because of his status as an inside director, and the concomitant substantial compensation he receives, Defendant Hu could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future.

101. Because of Defendant Hu's participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant Hu is unable to comply with his fiduciary duties and prosecute this action. Defendant Hu is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending himself in the Securities Class Action.

102. Moreover, Because Defendant Hu maintains majority voting power over the Company, the Company is a "controlled company" under the stock exchange listing standards

meaning that the Company need not have a majority independent Board. Not only this, but Defendant Hu maintains absolute control over the Board and the outcome of shareholder votes as he owns 100% of the Company's Class B Common Stock which, according to the Company's SEC filings, is entitled to 10 votes per share. Accordingly, the other Director Defendants could not consider a demand to sue Defendant Hu as that could have an adverse impact on their future re-election and continued service on the Board for which they receive lucrative compensation.

**Defendant Boyd, Luo, and Ma**

103. Defendants Boyd, Luo, and Ma serve as members of the Audit Committee. Pursuant to the Audit Committee Charter, Defendants Boyd, Luo, and Ma were specifically charged with the responsibility of assisting the Board in fulfilling its oversight responsibilities related to internal controls over financial reporting and public disclosure requirements.

104. However, Defendants Boyd, Luo, and Ma breached their fiduciary duties to the Company by failing to prevent or correct the issuance of material misstatements and omissions described herein. Therefore, Defendants Boyd, Luo, and Ma each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**Additional Reasons Demand is Futile**

105. The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

106. The Company, at all material times, had its Code of Conduct and related corporate governance policies which required each of the Individual Defendants to maintain the highest standards of honesty and integrity, particularly in relation to accurate and truthful public

disclosures. Yet, despite this Code of Conduct and other relevant policies and committee charters, each of the Director Defendants failed to ensure that the Company upheld high standards of integrity, misrepresented facts to the investing public, and failed to report any concerns, or investigate any misconduct, let alone commence litigation against the Individual Defendants.

107. In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. In violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, failed to maintain the accuracy of company records, public reports, and communications, and failed to uphold the responsibilities related thereto. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

108. The Director Defendants received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have benefitted from the wrongs alleged herein and have engaged therein to preserve their positions of control and the prerequisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

109. The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable

of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

110. Publicly traded companies, such as SES AI, typically carry director and officer liability insurance from which the Company could potentially recover some or all of its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover the Company's damages. If no such insurance is carried, then the Director Defendants will not cause the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event.

111. Accordingly, each of the Director Defendants, and at least a majority of them, cannot reasonably consider a demand with the requisite disinterestedness and independence. Indeed, any demand upon the Director Defendants is futile and, thus, excused.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### (Against the Individual Defendants for Breach of Fiduciary Duty)

112. Plaintiff incorporates by reference and re-allege each and every allegation contained above, as though fully set forth herein.

113. The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

114. The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

115. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their

fiduciary duties of loyalty and good faith by engaging in the wrongdoing discussed herein.

116. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

117. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION

## (Against the Individual Defendants for Gross Mismanagement)

118. Plaintiff incorporates by reference and re-allege each allegation contained above, as though fully set forth herein.

119. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a Huer consistent with the operations of a publicly held corporation.

120. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

121. Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

## THIRD CAUSE OF ACTION

**(Against the Individual Defendants for Waste of Corporate Assets)**

122. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

123. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going. It resulted in continuous, connected, and ongoing harm to the Company.

124. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend the Officer Defendants' unlawful actions.

125. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

**FOURTH CAUSE OF ACTION**

**(Against the Individual Defendants for Unjust Enrichment)**

126. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

127. By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and the detriment of, the Company.

128. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments

that were unjust in light of the Individual Defendants' bad faith conduct.

129. Plaintiff, as a shareholder and representative of the Company, seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

**FIFTH CAUSE OF ACTION**

**(Against the Individual Defendants for Violations of Section 10(b) of the Exchange Act)**

130. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

131. The Individual Defendants disseminated and/or approved public statements that failed to disclose the above-referenced truthful facts and, as a result of the foregoing, the Individual Defendants' public statements were materially false and misleading at all relevant times. Thus, the price of the Company's shares was artificially inflated due to the deception of the Individual Defendants. Despite this artificial inflation in the price of the Company's shares, the Individual Defendants caused the Company to repurchase millions of shares of Company stock, thereby causing significant financial harm to the Company.

132. As alleged herein, the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue

of their receipt of information reflecting the true facts regarding SES AI, their control over, and/or receipt and/or modification of SES AI's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning SES AI, participated in the fraudulent scheme alleged herein.

133. The Individual Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

134. The Individual Defendants were each members of SES AI's Board and senior management team during the aforesaid time period. Based on their roles at SES AI, each of the Individual Defendants would have been involved with, or knowledgeable about, the wrongdoing alleged herein.

135. At a minimum, the Individual Defendants failed to review or check information that they had a duty to monitor or ignored obvious signs that their statements were materially false and misleading or contained material omissions. Given the nature and extent of the problems at SES AI, the Individual Defendants knew and/or recklessly disregarded the extent and scope of their statements.

136. Likewise, the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein. The Individual Defendants had the ultimate

authority over and were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements regarding the Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

137. As such the Individual Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; and (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

138. As a result of the wrongful conduct as alleged herein, the Individual Defendants have violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder and are thus liable for any harm caused to the Company.

**REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment as follows:

A. Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B. Awarding, against all the Individual Defendants and in favor of the Company, the damages sustained by the Company as a result of the Individual Defendants' breaches of their fiduciary duties, gross mismanagement, waste of corporate assets, unjust enrichment, and violations of Section 10(b) of the Exchange Act;

C. Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors

from a recurrence of the damaging events described herein, including but not limited to removing and replacing its officers and directors;

D. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: July 6, 2026

**UTKELAW, PLLC**

By: /s/ Michael P. Utke______________
Michael P. Utke
P.O. Box 360
Pepperell, MA 01463
Telephone: (617) 314-6600
Email: mutke@utkelaw.com

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
260 Madison Ave., 22nd Floor
New York, NY 10016
Tel.: (212) 983-1300
Fax: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

***Attorneys for Plaintiff***